1  HANSON BRIDGETT LLP
   ALEXANDRA V. ATENCIO, SBN 227251
2  aatencio@hansonbridgett.com
   SAMANTHA A. BOTROS, SBN 317523
3  sbotros@hansonbridgett.com
   SAMANTHA BACON, SBN 351561
4  sbacon@hansonbridgett.com
   425 Market Street, 26th Floor
5  San Francisco, California 94105
   Telephone:   (415) 777-3200
6  Facsimile:   (415) 541-9366

7  Attorneys for Plaintiff
   GOLDEN GATE BRIDGE, HIGHWAY AND
8  TRANSPORTATION DISTRICT

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| GOLDEN GATE BRIDGE, HIGHWAY AND TRANSPORTATION DISTRICT,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF LABOR; JULIE A. SU in her official capacity as Acting Secretary of Labor; OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION; and DOUGLAS L. PARKER in his official capacity as Assistant Secretary of Labor for Occupational Safety and Health,<br><br>Defendants. | Case No. 3:24-cv-04985-RS<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff GOLDEN GATE BRIDGE, HIGHWAY AND TRANSPORTATION DISTRICT ("Plaintiff" or the "District") alleges causes of action against Defendants UNITED STATES DEPARTMENT OF LABOR; JULIE A. SU in her official capacity as Acting Secretary of Labor; OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION; and DOUGLAS L. PARKER in his official capacity as Assistant Secretary of Labor for Occupational Safety and Health (collectively "Defendants") as follows:

# INTRODUCTION

1. The District brings this action under the Administrative Procedure Act ("APA") 5 U.S.C. § 500, *et seq.*, challenging the United States Occupational Safety and Health Administration's ("OSHA") (a component of the Department of Labor under the authority of the Secretary of Labor Julie A. Su) illegal and unjustified attempt to reduce the factor of safety for temporary scaffolding designs—a requirement that improves workplace safety and protects employees from risk at work.

2. In 1996, OSHA issued regulations stating that each scaffold and scaffold component shall be capable of supporting, without failure, its own weight and at least four times the maximum intended load applied or transmitted to it. Maximum intended load is defined as "the total load of all persons, equipment, tools, materials, transmitted loads, and other loads reasonably anticipated to be applied to a scaffold or scaffold component at any one time." *See* 29 C.F.R. § 1926.451(a)(1) and 29 C.F.R. § 1926.450.

3. In interpreting this regulation, OSHA issued a December 6, 2013, Standard Interpretation Letter ("2013 Interpretation Letter") which made clear that "[u]nder section 1926.451(a)(1), each component of a scaffold system must be able to support at least 4 times the maximum intended load on that component, in addition to the weight of the component." The 2013 Interpretation Letter further explained that, for example, "on a multi-level scaffold, each bottom leg must be able to support its own weight and four times the load reasonably anticipated to be imposed on that leg. Part of the load imposed on a bottom leg will arise from the weight of the part of the scaffold that the bottom leg supports. Part will arise from the weight of persons, equipment, tools, and materials on the scaffold, and part will arise from other sources, such as wind." This interpretation emphasized the need to apply a factor of safety of four to all loads transmitted to the component being designed, including loads from the weight of the other scaffold members the component is supporting.

4. Seven years later, OSHA reversed course. On April 24, 2020, OSHA issued a revised version of the 2013 Interpretation Letter changing this long-standing guidance which directly conflicts with 29 C.F.R. § 1926.451(a)(1) and 29 C.F.R. § 1926.450 ("2020 Revised Interpretation

Letter"). Suddenly, OSHA claimed that transmitted loads arising from the portion of scaffold weight carried by the component are not subject to the prescribed safety factor of four. In fact, the 2020 Revised Interpretation Letter states that the weight transmitted from scaffold members supported by the component is not increased by any factor of safety at all – deviating significantly from the regulations and its prior established construction of 29 C.F.R. § 1926.451(a)(1) and 29 C.F.R. § 1926.450.

5. The 2020 Revised Interpretation Letter newly defines the weight of the scaffold component to include "the weight of the component itself, in addition to the portion of the scaffold's weight that is transmitted to that component."

6. The 2020 Revised Interpretation Letter dangerously decreases the requirement to apply a safety factor of four to all transmitted loads – in violation of the plain text and longstanding meaning of 29 C.F.R. § 1926.451(a)(1) and 29 C.F.R. § 1926.450 – without first engaging in the APA's requisite procedure. As such, the new rule is arbitrary, capricious, and otherwise contrary to law, as well as violative of the APA's notice and comment procedures.

**PARTIES**

7. The District is now, and was at all times hereinafter mentioned, a public agency existing under the laws of California. The District owns, operates, and maintains the Golden Gate Bridge. The District has a long history of protecting construction workers, dating back to its original construction. The Golden Gate Bridge was built in the midst of the Great Depression at a cost of $35 million. Of that amount, $1 million was spent on a temporary safety net to provide workers with fall protection. It was the first bridge built where all of the construction workers wore hard hats. Furthermore, the District receives federal funding, that requires, as a condition, compliance with Federal laws, including the relevant OSHA regulations.

8. The United States Department of Labor ("DOL") was created in 1913 (*see* Act of Mar. 4, 1913, 37 Stat. 736) and serves to foster, promote, and develop the welfare of the wage earners, job seekers, and retirees of the United States; improve working conditions; advance opportunities for profitable employment; and assure work-related benefits and rights. The DOL is the federal agency responsible for supervising the formulation, issuance, and enforcement of rules,

regulations, and policy by OSHA. It is an executive agency of the United State of America. Its principal address is 200 Constitution Avenue, NW, Washington, DC 20210.

9. Julie A. Su is the Acting United States Secretary of Labor. In this capacity, she is authorized to issue, amend, and rescind the rules, regulations and policies of OSHA. She is sued in her official capacity. Her principal address is 200 Constitution Avenue, NW, Washington, DC 20210.

10. OSHA was created in 1971 and seeks to ensure safe and healthful working conditions for workers by setting and enforcing standards and by providing training, outreach, education, and assistance. OSHA is a component of the Department of Labor. Its principal address is 200 Constitution Avenue, NW, Washington, DC 20210.

11. Douglas L. Parker is the Assistant Secretary of Labor for OSHA. In his capacity, he is responsible for assuring safe and healthful working conditions for working individuals by setting and enforcing standards and by providing training, outreach, education and assistance. He is sued in his official capacity. His principal address is 200 Constitution Avenue, NW, Washington, DC 20210.

## JURISDICTION AND VENUE

12. The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States, pursuant to 28 U.S.C. § 1331. This action arises under the APA, 5 U.S.C. § 500, *et seq.*, and the OSH Act, 29 U.S.C. § 651, *et seq*. Furthermore, jurisdiction lies under 5 U.S.C. § 702 (judicial review of agency action), and 5 U.S.C. § 703 (authorizing suits for declaratory and injunctive relief against agency action).

13. This Court also has the authority to issue the declaratory relief sought pursuant to 28 U.S.C. § 2201 and 5 U.S.C. § 706.

14. Venue is proper in this Court because Plaintiff resides in this district. *See* 28 U.S.C. § 1391(e)(1)(C).

## FACTUAL BACKGROUND

15. As a recipient of federal funds for federal-aid projects, the District is required to comply with federal laws and requirements, including, all relevant Occupational Safety and Health

Administration (OSHA) standards which are designed to protect worker safety and ensure robust safety practices on federally funded projects.

16. OSHA is charged with assuring "safe and healthful working conditions" for all working men and women in the United States through various means, including setting "appropriate reporting procedures with respect to occupational safety and health." 29 U.S.C. § 651.

**Background of 29 C.F.R. 1926.451(a)(1) and 29 C.F.R. 1926.450(b)**

17. In 1969, the Contract Work Hours Standards Act was amended, leading to the Construction Safety Act ("CSA"), which provided safer work environments for construction employees. Safety and Health Regulations for Construction were issued in 1971 under 29 C.F.R. part 1518.

18. The Occupational Safety and Health Act ("OSH Act") of 1970 allowed the Secretary of Labor to adopt these standards as OSHA standards, redesignating them as 29 C.F.R. part 1926 by the end of 1971.

19. In 1977, OSHA began a comprehensive review of scaffold standards due to concerns about their effectiveness. This review included consultations with the Advisory Committee on Construction Safety and Health ("ACCSH"). 61 Fed. Reg. 46026.

20. On November 25, 1986, OSHA issued a notice of proposed rulemaking on scaffolds used in construction. The proposal set a period, ending February 23, 1987, during which interested parties could submit written comments or request a hearing. OSHA twice granted requests for more time to submit comments and hearing requests. OSHA first extended the comment and hearing request period to June 1, 1987 and then extended that period to August 14, 1987. OSHA received 602 comments on the proposal, along with several hearing requests. 61 Fed. Reg. 46026.

21. On January 26, 1988, OSHA announced that it would convene an informal public hearing on March 22, 1988 to elicit additional information on specific issues related to scaffolds, fall protection and stairways and ladders. 61 Fed. Reg. 46026-46027.

22. The informal public hearing was held on March 22 and 23, 1988. At the close of the hearing, Judge Williams set a period, ending May 9, 1988, for the submission of additional comments and information. OSHA received 31 submissions, including testimony and documentary

evidence, in response to the hearing notice. 61 Fed. Reg. 46027.

23. On March 29, 1993, OSHA reopened the rulemaking record multiple times on subpart L "Scaffolds" to obtain additional comments and information regarding fall protection and safe means of access for employees erecting and dismantling scaffolds. On February 1, 1994, OSHA again reopened the rulemaking record to obtain comments and information regarding scaffolds. 61 Fed. Reg. 46027.

24. A wide range of employers, businesses, labor unions, trade associations, state governments, and other interested parties contributed to the development of this record. 61 Fed. Reg. 46027.

25. In the legislative history, OSHA noted that "[s]caffold-related incidents resulting in injuries and fatalities continue to occur despite the fact that OSHA has had a scaffold standard (existing subpart L) in place since 1971." It further noted "compliance with the standard being published today will be better than it has been in the past because this standard has been simplified, brought up to date, and strengthened to provide additional protection." Furthermore, OSHA's final rule estimated that, of the 510,500 injuries and illnesses that occur in the construction industry annually, 9,750 are related to scaffolds. In addition, of the estimated 924 occupational fatalities occurring annually, at least 79 are associated with work on scaffolds. Furthermore, seventy-two percent of the workers injured in scaffold accidents covered by the BLS study attributed the accident either to the planking or support giving way, or to the employee slipping, or being struck by a falling object. 61 Fed. Reg. 46027.

26. OSHA cited the following example for the OSHA Integrated Management Information System "of the types of accidents that continue to injure and kill employees working on scaffolds":

> In July, 1991, two employees were working on a pump jack scaffold doing roofing work. The scaffold became overloaded and broke. The employees fell 12 feet to the ground, resulting in one fatality and one serious injury.

61 Fed. Reg. 46027.

27. As a result, OSHA determined that "employees using scaffolds are exposed to a

1  significant risk of harm. Specifically, scaffold related fatalities still account for 9% of all fatalities
2  in the construction workplace." Consequently, OSHA found "that the revision of its scaffold
3  standards for construction is necessary to improve employee protection. OSHA has determined that,
4  as revised, the standard clearly states employers' duties and the appropriate compliance measures."
5  61 Fed. Reg. 46027-46028.

6        28.    On August 30, 1996, OSHA issued its Final Rule for Safety Standards for Scaffolds
7  Used In the Construction Industry. In that Final Rule, OSHA replaced the terms "maximum rated
8  load" and "workload" with the term "Maximum Intended Load."

9        29.    29 C.F.R § 1926.450(b) defines "Maximum Intended Load" as "the total load of all
10 persons, equipment, tools, materials, transmitted loads, and other loads reasonably anticipated to be
11 applied to a scaffold or scaffold component at any one time." This regulation has not been altered
12 since 1996.

13       30.    29 C.F.R 1926.451(a)(1) states "[e]xcept as provided in paragraphs (a)(2), (a)(3),
14 (a)(4), (a)(5) and (g) of this section, each scaffold and scaffold component shall be capable of
15 supporting, without failure, its own weight and at least 4 times the maximum intended load applied
16 or transmitted to it." This regulation has not been altered since 1996.

17 **December 6, 2013 Standard Interpretation Letter**

18       31.    On December 6, 2013, James G. Maddux, then Director, Directorate of Construction
19 of OSHA, issued a Standard Interpretation Letter in response to an inquiry from Mr. Steve Karasik
20 of PERI Formwork Systems, Inc.

21       32.    This 2013 Interpretation Letter provided guidance on the interpretation of 29 C.F.R.
22 1926.450(b) and 1926.451(a)(1) regarding the factor of safety to be applied to loads in temporary
23 scaffold design.

24       33.    The inquiry posed by Mr. Steve Karasik was: "For scaffolds used in construction
25 work, how is the weight of the scaffold taken into consideration in determining whether the 4 to 1
26 factor required by 29 C.F.R. 1926.451(a)(1) is satisfied? How do the scaffolding requirements for
27 general industry work differ from construction?"

28       34.    The response provided by OSHA in the 2013 Interpretation Letter was: "Under

section 1926.451(a)(1), each component of a scaffold system must be able to support at least 4 times the maximum intended load on that component, in addition to the weight of the component."

35. The letter further elaborated that: "As this language makes clear, in applying section 1926.451(a)(1), each component of a scaffold must be able to support its own weight, plus 4 times the total load on that component. For example, on a multi-level scaffold, each bottom leg must be able to support its own weight and four times the load reasonably anticipated to be imposed on that leg. Part of the load imposed on a bottom leg will arise from the weight of the part of the scaffold that the bottom leg supports. Part will arise from the weight of persons, equipment, tools, and materials on the scaffold, and part will arise from other sources, such as wind."

36. The interpretation of section 1926.451(a)(1) provided in the 2013 Interpretation Letter was consistent with the plain language of the regulation and the definition of "maximum intended load" under section 1926.450(b), which requires a factor of safety of four to all loads transmitted to the component being designed, including loads from the weight of other scaffold members the component is supporting.

37. The 2013 Interpretation Letter emphasized the proper application of the factor of safety to all transmitted loads.

**April 24, 2020 Revised Standard Interpretation Letter**

38. On April 24, 2020, OSHA released a revision of the December 6, 2013 Standard Interpretation letter. This revision was not a new letter but a heavily redlined version of the 2013 Interpretation Letter, and it was unsigned by the new author.

39. This revision altered the guidance provided by Director Maddux, despite the fact that the regulations under 29 C.F.R. 1926.450(b) and 1926.451(a) had not changed since their implementation in 1996.

40. The April 24, 2020 revisions state that transmitted loads arising from the portion of scaffold weight carried by the component being analyzed are not subject to the prescribed safety factor of four.

41. The revised interpretation suggests that the weight transmitted from scaffold members supported by the component is not increased by any factor of safety at all, which

contradicts the plain language of 29 C.F.R. 1926.451(a) and 1926.450(b).

42. The 2020 Revised Interpretation Letter states: "Under section 1926.451(a)(1), each component of a scaffold system must be able to support its own weight (the weight of the component itself, in addition to the portion of the scaffold's weight that is transmitted to that component), and at least 4 times the maximum intended load transmitted to that component."

43. The 2020 Revised Interpretation Letter also newly defines the weight of the scaffold component to include "the weight of the component itself, in addition to the portion of the scaffold's weight that is transmitted to that component."

44. This differs significantly from the regulations, which included the transmitted load in the calculation of the maximum intended load.

45. The 2020 Revised Interpretation Letter results in components being designed against the point of failure without a safety factor on the portion of the scaffold's weight supported by the component, exposing construction workers to less safe conditions.

46. The revisions ignore common engineering practices that account for underestimation of loads, unexpected additional loads, unanticipated uneven distribution of loads, potential lower than expected ultimate strength/capacity of the component, component fatigue, and other factors that necessitate the application of a factor of safety.

47. In revising the definition of Maximum Intended Load via the 2020 Revised Interpretation Letter, OSHA promulgated a new substantive rule without the requisite notice-and-comment procedures, and also failed to consider the impact this change would have on other sections, including 29 C.F.R. 1926.451(a)(3) and 29 C.F.R. 1926.451(a)(4).

48. On June 23, 2020, the District sent a letter to Scott Ketcham, Director, Directorate of Construction for the DOL and OSHA, with copies to the Secretary of Labor, the Deputy Assistant Secretary for Congressional and Intergovernmental Affairs, and the Principal Deputy Assistant Secretary of Labor for OSHA (who was serving as Acting Assistant Secretary of Labor at the time). The letter requested the withdrawal of the 2020 Revised Interpretation Letter, arguing that it was inconsistent with the plain meaning of the regulations. OSHA declined to withdraw the letter.

/ / /

**Impact of OSHA's New Standard On District Projects and Operations**

49. The District had at the time of the issuance of the 2020 Revised Interpretation Letter, and will have, construction projects that receive federal financial assistance. All federal-aid projects require the District to include compliance with federal laws and regulations in the terms of the contract documents. Accordingly, all federal-aid projects are required to comply with all applicable Federal OSHA regulations, including, 29 C.F.R. 1926.

50. For example, the District contracted with Shimmick/Danny's Joint Venture ("Shimmick") for its Physical Suicide Deterrent System and Wind Retrofit Project (the "Project"). The Project aimed to enhance safety on the Golden Gate Bridge by implementing physical deterrents to prevent suicides on the Bridge, which had historically averaged 30 fatalities per year.

51. The Project scope, in part, required Shimmick to design and build scaffold access systems on the Bridge in accordance with federal standards, including OSHA's construction safety and health standards pursuant to 29 C.F.R. 1926. Failure to meet these standards jeopardizes both worker safety and the District's compliance with federal funding requirements.

52. The District required Shimmick to design and build the scaffold access systems on the Bridge in compliance with 29 C.F.R. 1926.451(a)(1), which requires a factor of safety of four to all loads transmitted to the component being designed, including loads from the weight of other scaffold members the component is supporting, as stated both in the rule itself and in OSHA's 2013 Interpretation Letter. Shimmick disputed that 29 C.F.R. 1926.451(a)(1) required it to design and build the scaffold access systems to this factor safety of four and, thus, asserted that it was not obligated to design and build the scaffold system to that specification as a term of the contract.

53. Shimmick hired an engineer to reach out to OSHA to request help in changing OSHA's 2013 Interpretation Letter. This engineer represented that he had ties to the scaffolding industry community and that the industry was concerned with the longstanding OSHA interpretation of 29 C.F.R. 1926.451(a)(1) that required a higher factor of safety. As a result of this outreach from Shimmick, OSHA ultimately issued the 2020 Revised Interpretation Letter. OSHA surreptitiously discussed revising the 2013 Interpretation Letter with Shimmick's engineer without engaging in the notice-and-comment procedure and, on information and belief, without notifying interested parties.

In addition, rather than issue a new interpretation letter, OSHA interlineated the 2013 Interpretation Letter, which hid the identity of Shimmick's hired engineer and also did not reveal the identity of the OSHA representative who reviewed and changed 29 C.F.R. 1926.451(a)(1) via the 2020 Revised Interpretation Letter.

54. In reliance on the 2020 Revised Interpretation Letter, which reduces the factor of safety required in scaffolding design, Shimmick delayed finalizing the scaffolding systems design for the Project. This has delayed the timely completion of the Project, resulting in additional costs, which in turn has delayed achieving the District's important goal of deterring suicides on the Bridge and the Project's life-saving purpose, all to the District's detriment.

55. In addition, Shimmick asserted that the District's required design for the scaffolding systems was not mandated by the OSHA requirements and therefore the District was obligated to pay Shimmick for Project delays and cost overruns associated with having to design the scaffolding systems to a factor of safety of four for all loads transmitted to the component being designed, in the multiple millions of dollars. Ultimately, to resolve the dispute with Shimmick and avoid the increased risk of liability and increased danger to worker safety, the District had to bear the cost for Shimmick to design the scaffolding systems to the proper factor of safety of four.

56. The 2020 Revised Interpretation Letter also delayed the installation of scaffolding required to remove and replace the Golden Gate Bridge's existing maintenance travelers with new platforms that the District plans to use for mandatory biennial bridge inspections required by the Federal Highway Administration, which were scheduled to begin in early 2021. Because the new maintenance travelers were not available as planned, the District was forced to hire a third-party engineering firm with specialized expertise in alternate access methods to perform the mandatory inspections, costing $9 million over four years.

57. The delay in the installation of maintenance travelers essential for Bridge inspections disrupts the District's ability to conduct routine inspections and maintenance in a timely manner. This directly impacts the District's operational efficiency, increases financial burdens, and compromises the ongoing safety and integrity of the Golden Gate Bridge.

58. When the District receives federal-aid for a project, the District is required to comply

with federal OSHA requirements. The District anticipates increased costs in future federal-aid projects involving scaffolding subject to 29 C.F.R. 1926.451(a) as a result of the 2020 Revised Interpretation Letter. For example, the District's Seismic Retrofit Project, which involves this type of scaffolding, has been delayed resulting in escalated labor and material costs.  In addition, projected costs for the Seismic Retrofit Project now must account for the difference between the previous, stricter safety requirements under 29 C.F.R. § 1926.451(a)(1)—which clearly mandated a safety factor of four for all loads transmitted to the designed component, including loads from the weight of other scaffold members (a standard the District required all contracts to meet)—and the more relaxed standard introduced by the 2020 Revised Interpretation Letter. This shift imposes an additional financial and operational burden on the District.

## FIRST CLAIM FOR RELIEF

### (Declaratory Judgment – Violation of 5 U.S.C. § 706(2)(D))

59. The allegations in paragraphs 1 through 58 are incorporated herein.

60. The APA requires this Court to hold unlawful and set aside any agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

61. The Supreme Court has held that all legislative rules—which are those having the force and effect of law and are accorded weight in agency adjudicatory processes—must go through the notice-and-comment requirements. *Perez v. Mortgage Bankers Ass'n*, 135 S.Ct. 1199, 1204 (2015).

62. As an authority of the government of the United States, OSHA is an agency subject to the Administrative Procedure Act. *See* 5 U.S.C. § 551(1). None of the Act's "agency" exceptions applies to OSHA. *See id.* § 551(1)(A)-(H).

63. In 1996, OSHA issued regulations stating that scaffolds and scaffold components shall be capable of supporting, without failure, its own weight and at least four times the maximum intended load applied or transmitted to it. *See* 29 C.F.R. § 1926.451(a)(1) and 29 C.F.R. § 1926.450.

64. In interpreting this regulation, OSHA issued the 2013 Interpretation Letter which made clear that "[u]nder section 1926.451(a)(1), each component of a scaffold system must be able to support at least 4 times the maximum intended load on that component, in addition to the weight

of the component." The 2013 Interpretation Letter further explained that, for example, "on a multi-level scaffold, each bottom leg must be able to support its own weight and four times the load reasonably anticipated to be imposed on that leg. Part of the load imposed on a bottom leg will arise from the weight of the part of the scaffold that the bottom leg supports. Part will arise from the weight of persons, equipment, tools, and materials on the scaffold, and part will arise from other sources, such as wind." This interpretation emphasized the need to apply a factor of safety of four to all loads transmitted to the component being designed, including loads from the weight of other scaffold members the component is supporting and was consistent with the plain language of 29 C.F.R. § 1926.451(a)(1) and 29 C.F.R. § 1926.450.

65. Seven years later, OSHA reversed course. On April 24, 2020, OSHA issued a revised version of the 2013 Interpretation Letter changing this long-standing guidance which directly conflicts with 29 C.F.R. § 1926.451(a)(1) and 29 C.F.R. § 1926.450 ("2020 Revised Interpretation Letter"). Suddenly, OSHA claimed that transmitted loads arising from the portion of scaffold weight carried by the component are not subject to the prescribed safety factor of four. In fact, the 2020 Revised Interpretation Letter states that the weight transmitted from scaffold members supported by the component is not increased by any factor of safety at all – deviating significantly from 29 C.F.R. § 1926.451(a)(1) and 29 C.F.R. § 1926.450.

66. The 2020 Revised Interpretation Letter also newly defines the weight of the scaffold component to include "the weight of the component itself, in addition to the portion of the scaffold's weight that is transmitted to that component."

67. Defendants have promulgated an amendment to 29 C.F.R. § 1926.451(a)(1) and 29 C.F.R. § 1926.450, unilaterally reducing the factor of safety for temporary scaffolding designs via the 2020 Revised Interpretation Letter.

68. With exceptions that are not applicable here, the APA requires that any "rules which do not merely interpret existing law or announce tentative policy positions but which establish new policy positions that the agency treats as binding must comply with the APA's notice-and-comment requirements, regardless of how they initially are labeled." 72 Fed. Reg. 3433. None of the few limited exceptions to the general notice-and-comment obligation applies to the 2020 Revised

Interpretation Letter, because the 2020 Revised Interpretation Letter is an amendment to OSHA's existing legislative rule governing scaffolding requirements.

69. At minimum, notice-and-comment rulemaking requires that OSHA (1) issue a public notice of the proposed rule, most often by publishing notice in the Federal Register, (2) give all interested parties a fair opportunity to submit comments on the proposed rule as well as evaluate and respond to significant comments received, and (3) include in the final rule's promulgation a concise statement of the rule's basis and purpose.

70. The 2020 Revised Interpretation Letter is substantially different from that offered by OSHA's existing scaffold-regulations, 29 C.F.R. 1926.451(a)(1). The 2020 Revised Interpretation Letter also newly defines the weight of the scaffold component to include "the weight of the component itself, in addition to the portion of the scaffold's weight that is transmitted to that component."

71. The substantial differences between 29 C.F.R. 1926.451(a)(1) and the 2020 Revised Interpretation Letter demonstrate that the latter's "interpretation" of 29 C.F.R. 1926.451(a)(1) is in fact an amendment, modification and/or revision to the regulation.

72. This action is timely because it has been commenced within six years of April 24, 2020, the date of the 2020 Revised Interpretation Letter's promulgation. 28 U.S.C. § 2401(a) (six-year statute of limitations for actions seeking nonmonetary relief against the federal government).

73. Because the 2020 Revised Interpretation Letter is an amendment to a legislative rule, it is itself a legislative rule. In promulgating the 2020 Revised Interpretation Letter, OSHA did not give the public prior notice or an opportunity through comment to participate in the rule's formulation.

74. In creating different obligations, Defendants failed to properly engage in notice-and-comment rulemaking. As a result, the April 24, 2020 Revised Interpretation Letter should be declared unlawful and set aside.

75. The District has suffered a clear, concrete injury as a result of the 2020 Revised Interpretation Letter, including but not limited to, financial harm, additional operational costs, the need for alternative Bridge inspection methods, impacts on critical safety measures related to

federally-funded Bridge projects, and ongoing uncertainty related to compliance with, and enforcement of, OSHA's scaffolding safety rules.

## SECOND CLAIM FOR RELIEF

### (Declaratory Judgment – 5 U.S.C. § 706(2)(A))

76. The allegations in paragraphs 1 through 75 are reincorporated herein.

77. The APA requires this Court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

78. Congress requires that whenever an agency takes action, it do so after engaging in a process by which it "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Veh. Mfrs. Ass'n. v. State Farm Ins.*, 463 U.S. 29, 43 (1983) (quotation omitted).

79. An agency action is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or product of agency expertise.

80. Defendants gave no explanation for their departure from explicit statutory text, including 29 C.F.R. 1926.451(a)(1) and 29 C.F.R. 1926.450(b) whereby Defendants unilaterally decreed that the weight of scaffold components transmitted to the analyzed component is not subject to the prescribed safety factor of four.

81. Nor did Defendants give any explanation of the relevant factors that were the basis of their actions.

82. Defendants failed to consider important aspects of safety issues caused by the 2020 Revised Interpretation Letter, and ignore the legislative histories of 29 C.F.R. 1926.451(a)(1) and 29 C.F.R. 1926.450(b), which explicitly state that the revised standards are required to clearly state employers' duties and the appropriate compliance measures because employees using scaffolds are exposed to a significant risk of harm.

83. Defendants fail to consider the practical harms created by Defendants' unlawful application of 29 C.F.R. 1926.451(a)(1) and 29 C.F.R. 1926.450(b). Specifically, if the new interpretation of 29 C.F.R. 1926.451(a)(1) is applied, it results in a component to be designed against the point of failure with no factor of safety on the portion of the scaffold's weight supported by the component.

84. Furthermore, Defendants fail to consider that a margin of safety is necessary to account for: underestimation of loads, unexpected additional loads, unanticipated uneven distribution of loads, possible lower than expected ultimate strength/capacity of the component, component ultimate capacity deterioration due to repeated use, component fatigue due to imposed vibrations causing lowering of the component's ultimate capacity. These factors must be compensated by the application of a factor of safety on the total load transmitted to that component, as required by the plain language of 29 C.F.R. 1926.451(a)(1).

85. Defendants' failure to consider essential safety margins in their revised interpretation exposes construction workers to significant risks and undermines the protective intent of the regulations.

86. The District has suffered a clear, concrete injury as a result of the 2020 Revised Interpretation Letter, including but not limited to, financial harm, additional operational costs, the need for alternative Bridge inspection methods, impacts on critical safety measures related to federally-funded Bridge projects, and ongoing uncertainty related to compliance with, and enforcement of, OSHA's scaffolding safety rules.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court issue a decree and order for the following relief:

1. Declaratory judgment that Defendants have acted not in accordance with law and without observance of procedure as required by law, issuing the 2020 Revised Interpretation Letter, because the public was not afforded notice or an opportunity to comment before it was promulgated and therefore is unlawful, invalid and vacated;

2. Declaratory judgment that the 2020 Revised Interpretation Letter is arbitrary and

capricious and therefore invalid and vacated;

    3.    An order of reasonable attorney fees and costs pursuant to 28 U.S.C. § 2412;

    4.    An order granting such other and further relief as this Court deems just and proper.

DATED: November 15, 2024          HANSON BRIDGETT LLP

By:    */s/ Samantha A. Botros*
ALEXANDRA V. ATENCIO
SAMANTHA A. BOTROS
SAMANTHA BACON
Attorneys for Plaintiff
GOLDEN GATE BRIDGE, HIGHWAY AND TRANSPORTATION DISTRICT